Okay, Councilor, are you ready to proceed, Mr. King? Yes, sir, I am. Okay, good. Your mic is a little bit... I can hear you, but it's kind of faint. Okay, is that any better, Your Honor? It's still fairly faint. Can you turn the volume up a bit? I turned it up to the max, and let's see if there's anything else I can do here. Well, I can hear you. Why don't we just go ahead. Okay. Your Honor, good morning. May it please the Court, Stanley King, appearing on behalf of the Appellant, Tutis. Your Honor, can I please reserve two minutes of my time for rebuttal? Yes. Thank you, Your Honor. Your Honor, in the interest of time, because there are a number of issues, salient issues that I want to discuss, I decided that I would combine all of my probable cause issues, and therefore, hopefully, I would be able to do that in a more concise fashion. It's just in the interest of time. So I'd like to begin by... I am reminded this morning that Dr. King once said that the reason he was in Birmingham, when he wrote the Birmingham letter, he said it was because injustice was there. Good morning, Your Honor. I think I'm here today because I feel injustice is here. Obviously, not in the same sense, but... No, not in the same sense. I didn't judge the imagination. I'm glad you corrected that. Not in the same sense at all, Your Honor, but I believe that our Fourth Amendment or probable cause is hanging by the thread in this case. I think it's an important case because if this is allowed to stand, I think it's going to be an erosion of the requirements of our probable cause, and therefore... Let me ask you this, Mr. King. I understand that the report, Agent Dorn's or Officer Dorn's report was written, I think, seven or eight days after he unfortunately had the discussion with a confidential informant that led him to the report. I assume it was sometime after the report. Yes, Your Honor. From what I gathered and what I remember, I believe the report was drafted around the 26th of September, and I think based upon what is written, if you're talking about the affidavit report, that was written on the day that it was signed. I believe that was the 26th of September. If you're talking about the report or his Friday reports or his reports, again, that was probably written just slightly before he submitted to Judge DeLore, and I believe... Because there are a number of discrepancies between... Well, discrepancies all over the place, but when a discrepancy seemed to appear at the Franks hearing between dates and things, he seemed to refer to his report and said that the report was accurate. Am I right about this? The report was accurate, but the affidavit was incorrect, even though I would assume that the report may have been more contemporaneous with the discussion with the informant than the affidavit was, but maybe I'm wrong about that. Well, Your Honor, he had written a report almost two years after that. During the Franks hearing, there was a discrepancy in that report and what he had disclosed to Judge DeLore in his affidavit, and he was asked to reconcile that, and I believe he said that that was him being careless or just inaccurate, and he explained it away basically as if that was just a normal mistake, but it was a critical mistake because it went to the credibility of the confidential informant. It was a discrepancy as to whether the information that confidential informant received was actually received from toy tutors or whether it was received from his brother. Are we talking about Santana? Yes, Santana is jewel tutors, Your Honor. Initially, the confidential informant told detectives... We're really talking about the card. You're really talking about the card with the names and the cell phone numbers, right? Yes, Your Honor. I'm definitely talking about that, but he also represented to Detective Dorn that toy tutors was known as Santana. Now, Detective Dorn, based upon all his interceptions of these communications, he knew that that was inaccurate. He knew that it was actually toy tutors' brother, Jewel. He was the one who always referred to himself and he was known as Santana. The interceptions came after the search warrant was obtained, right? Or the wire warrant was obtained. Well, Your Honor, I think that there were interceptions. That is correct. In the initial interception, he made references about Jewel Tutors and knowing that he had had these different numbers associated with him. Toy Tutors, his brother, he did not make any reference to any number associated with Toy Tutors, other than to say that we've accepted... We relied on this confidential informant. He's reliable and we basically believe what he's telling us. But that, again, Your Honor, was just a bare-boned statement not supported by any documentation. And the critical thing here in that application in front of Judge Delorey, he painstakingly lists every single number that he knew that Jewel Tutors had to support that application because that was necessary to prove that Jewel Tutors constantly changed his numbers in order to thwart law enforcement. And in fact, he did. He probably every week. He did it every week. Jewel did that every week. However, when it came to Toy Tutors, which is the issue why we're here today, he never supported that with anything to say that. As a matter of fact, Your Honor, he says back in August, we had Toy Tutors' number. But in September, even the last time they applied for the CSS war, in October, Toy Tutors still had the same number. He hadn't changed the number. So this was over a month and a half. Did he have any additional numbers? We're talking about 1761, right? The 424-646-1761. Did he ever have any numbers other than 1761? Well, Judge, they're alleging that he had other numbers, but they offered no proof to that. They offered no proof. They said he had any number. They didn't say that he dropped numbers because if, in fact, if you believe what they're saying is that the purpose of why people dropped numbers, so that number would never be associated to him, he kept that number all along. That was his number. And they went ahead, and they looked at that number, and they didn't find anything. They didn't catch anything. Judge, here's the other thing that's so critical about this confidential informant. There's never any conversation or a audio or video that captures Toy Tutors and this confidential informant. One of the things that he said- What about this time, I guess it's not conclusive, who had the orange T-shirt on, but there is some suggestion that, was the CI in this David store? On that occasion, was that CI not- Go ahead, because the CI was wearing the video that captured the scene. So the informant was in the store. The informant said the toy was in the store in the orange T-shirt, but it's not clear who's wearing the orange T-shirt because it's a blurred video. Right, Judge, but here's the thing that's critical about that meeting in the confidential informant came out and said, Toy Tutors told him you could take anything you want. Detective Dorn went back, wrote his report that day to the Atlanta County Prosecutor's Office, took the audio, took the video down, and he recognized Santana Jewel's voice, and he said, and he recognized that that's not true. That was not Toy Tutors who said that. That was Jewel Tutors who said you can take anything you want. And that was critical because that confidential informant who is supposed to be reliable and who they are relying on, they knew at that point, at best, it was a mistake. At worst, that was a lie. That just was not accurate. And they reported that in the affidavit to Judge Delorey. I'm sorry, Your Honor. You said they reported that, but what is the that that you're referring to? Oh, they reported that the confidential informant went into Dave's store and Toy said you can take anything you want. So obviously, that would place Toy in that store and having been a part of or at least viewed these drug transactions that allegedly took place. Detective Dorn, once he went back that day to the Atlanta County Prosecutor's Office, he said he downloaded the audio as well as the video and wrote his report. When he did that, he recognized that that was a mistake or wasn't accurate. It was not true that that was not Toy who said that. That was the brother. And therefore, he had an obligation to tell Judge Delorey. Well, first of all, he had an obligation not to include that in an affidavit that he was going to present to the court to use to get a warrant. But he also had an obligation to tell Judge Delorey that's mistaken. It's not a gotcha game or a guessing game. He had to tell Judge Delorey in fairness to say this person I'm relying on, at worst, sometimes he's not as reliable as we think. And just to that point, the reliability of this CI, I have to bring his credibility into question. Back in 2012, this so-called reliable confidential informant approached Dorn and said, I believe Toy Tutis is involved in the drug business. Detective Dorn stopped what he was doing and investigated him for months, maybe even up to a year, found nothing, and closed the investigation. So therefore, that information that he provided to Detective Dorn as a basis for them to launch this investigation was unreliable. But the 2012 information was not part of the subsequent, the case that we're here for today. That's correct, Judge. But here's the thing. One of the things that Detective Dorn said, as a prerequisite, he said, I have a confidential informant who is reliable. I've used him in the past, and he is a reliable source. So I take you back to the 2012, when he was not that reliable. Did he say, I have a reliable informant, I've used him in the past, who is reliable? Or did he say, I have a reliable informant, and I have used him in the past? I know the inference is still there. It's subtle. But in one statement, it's a flat-out misstatement. In the other one, it's really an inference. Well, Judge, that is a great question that I am not prepared to say I know definitively. But I do agree with you that the inference is there, that I've used him, I rely on him, and I believe I can rely on the things that he tells me because I think, as I recall, what he said was he used him in the past, and the information that he's provided me in the past has proved to be reliable. It's been true. And that was 2012, and that wasn't true. And as this 2014 progressed, this so-called reliable witness, he said a couple of things. Judge, you mentioned the business card. Initially, this confidential informant said that Toye Tutis gave him this card, and he wrote the names on the back. Come to find out, later on, Detective Dorham realized that that wasn't true. Toye Tutis didn't give him that business card, or at least he said the confidential informant was the one who wrote the name Santana and Jewel along with those phone numbers on the back of that card. And one of the things we pointed out, Judge, the name Jewel was misspelled, and the confidential informant, later on, did say, no, I was the one who wrote the names and not Toye Tutis. So, therefore, that was something that Judge Delury should have known that that so-called business card was not offered. Critical to all of this, Judge, both of those numbers on that card, Detective Dorham never ran any type of registration register to say, who do these numbers belong to? None of those numbers ever were traced back to Toye Tutis. When he called Toye Tutis, the only one time that they allege they have Toye Tutis on a phone call was when the confidential informant called and said he wanted to buy some donuts and someone on the other end said, call my brother. And that was it. Phone hung up, call my brother. The confidential informant is saying that he recognizes that voice to be Toye Tutis. Detective Dorham, who's never met or had a conversation with Toye Tutis, is saying that he recognized that three word, call my brother, to be Toye Tutis. Oh, he said he recognized it. There were prior, there were prior wiretaps from which he may have heard that voice. Judge, what he used was, he said a YouTube advertisement or something where he saw Toye Tutis on a YouTube, that from that was the basis on which he drew his recognition of that voice based upon three... Mr. King, let me hone in a little closer. You know, you're making some very general arguments here. But your claim about the September affidavit was that it does not establish a substantial basis or a fair probability that criminal activity was occurring. That's your claim on the September affidavit. That's correct, sir. That's in your... What more, what more was needed to establish a substantial basis? Well, Judge, I think it says clearly that the affidavit, it has to be substantiated and it can't be a... Reliability has to be substantiated. Exactly. It has to be substantiated and it can't just be a bare bone allegation that is unsubstantiated with anything more than that. And there was no link to Toye Tutis to justify it. They may have had a very compelling argument against his brother, June, and they supported that in the affidavit, but they didn't do anything to support it against Toye Tutis. And that is why I'm saying this is deficient because what they've basically done and asked this court to do is, because we think that, and I even saw this in the governor's brief, because we think June was involved with this and he knows how to switch phones, we should also respect or accuse Toye Tutis of doing the same. And obviously, that's not the case. We can't do that. We can't say that because his brother did this, we have probable cause to do the same thing for you or treat you the same way. There was in any way at all that they used anything to show, to support that, the need for a warrant against Toye Tutis. Mr. King, help me understand this business about two things. I want to get to the plea and we're going to go over time, and it's your point to go over time too, because we haven't even discussed the plea yet and your time is up. What is this business with the false IDs? I don't get that at all. I guess the theory is that he wants false IDs, he sells false IDs to use postal drops for drug deliveries. Is there anything in the record at all of any substantiated allegation or even an allegation that Toye is using the post office and phony post office boxes to get drug deliveries? It just seems they've got him on selling false IDs and they bridge that over somehow to a drug business. That is my interpretation as well. I know that during the point in time when they intercepted those conversations, there were conversations that they picked up that Mr. Tutis was involved with post office box and false IDs or driver's license. Everything about using those to secure drugs or as part of a drug conspiracy, that was all part of Detective Dorn's speculation and assumption. There wasn't anything at that point in time that said Toye Tutis was involved with any of that other than Detective Dorn, meaning upon his own experience, he said that he knows that's what happened, but he never said specifically anything that Toye Tutis did to prove that that was in essence a fact when it relates to Toye Tutis. That was not the case at all. Okay. Well, help me understand what happened with the linkage and the de-linkage of the guilty. Now, at one time his Toye's plea was tied to his wife's plea and he would get a break on condition he pled and his wife would get a conditionally a break and then that was undone? Well, exactly. What happened was throughout all the negotiations, pre-negotiations with the government, the government insisted that the wife had to plead simultaneously to the plea agreements that was presented. The government was not going to take a plea from one without taking the plea of the other and that was understood all along. And that's on the record? That's on the record. Even the plea agreement clearly states that these pleas are packaged. These are tied deals. October 31st, Toye Tutis does not want to take the deal. They've already picked a jury. He does not want to go through with it. The government, prior to this, had offered 60 months to his wife, Jasmine Baker. 60 or 16? Zero. 60 months. Five years. Five years to his life. When he refused, all of a sudden, her plea now or her offer now went to 78 months. Okay? So they went up 18 months after he decided he was not going to take his plea. That night, he was at the federal detention center in Philadelphia in an unguarded conversation with his wife. She was hysterical. She was in poor health. She wanted to get out of this case and he knew that. And he and his wife had a conversation and he said to her, an unguarded conversation, I am going to get you out of this case tomorrow. I'm just going to take the deal so that they won't stop doing what they're doing to you because I know this is horrible and I'm just going to tomorrow. But that clearly didn't get her out of the case. It clearly didn't get her out of taking her plea and moving on. So he's going to plea in order to stop the case from going further. It wouldn't have to go to trial and therefore, they wouldn't continue to raise her offer. The next day, on November 1st, he goes, he does take the plea. And obviously, the plea quality is what it is, the factual basis. It wasn't until during that period of time, over that night, the government excised the package portion out of the plea offer. They no longer made it a requisite that both of them had to plea. But they never disclosed that to defense counsel. They made a material change in the plea offer. Isn't that disputed? Because Farrell testified to that effect and he was not exactly an overwhelming witness in the judge's eyes. The judge didn't buy his testimony. Well, judge, let me say this. I don't think that part is disputed, whether the government ever told Farrell or Mr. Tudis that they excised that language. They're saying that they knew that the plea was a package because they say that his wife knew and his wife's counsel knew. But Mr. Farrell clearly says, I've never read it. Matter of fact, I don't think- Yeah, but Farrell, you know, we're limited in what we can do with Farrell because Judge Simino didn't buy his testimony. It wasn't very credible. No question, Judge, but I think part of that was, it was the atmosphere in which we were in during that period of time, thinking what was going on with Mike Farrell personally. My client, Mr. Tudis, also said, I did not know it was unpackaged. No one ever told me it was unpackaged. And quite honestly, Judge, there was no way to, I mean, it was just not something that was being negotiated. So when they took it out of the plea, it caught everyone by surprise because at that point in time, they had moved on. They were actually only negotiating for property and things like that. So when the government decided in a lot of ways to take the package language out of the plea, it was unbeknownst to everyone. They just didn't read it. And the government even said, with the transcript, we took it out. We never asked anybody. It wasn't bargained for. We just took it out because we wanted the pleas to go forward. And Mr. Tudis said, had I known that, I would have got my wife out. I would have went to trial. So therefore, he's saying that under that scenario, because I did not know that that took place and my counsel didn't tell me that, that wasn't a voluntary plea. Under Hodge, there is a colloquy that needs to take place. We know we're familiar with Hodge. But in terms quite a while. So let me find out what your opponent has to say about this. And I think it started with Ms. Comazoli, is that correct? You're muted. I can't hear you. I can't hear. Patrick, did you mute her? No, I did not. I don't see her mute button. Unless your mic is not on. What was the name of that old TV show where they did pantomimes? There were teams and they did pantomimes. It was like, sounds like three syllables for a syllable. That's what we should do here. I can't remember the name of it. Mike's old enough to remember it. Dave's probably not old enough. I vaguely remember the name. Dave's a youngster. I don't remember that. He read about it. Yeah, he read about it. Yeah. He would not remember it. He would not remember it. Mr. King probably wouldn't remember it either. He looks pretty youthful. Actually, I think that was called What's My Line? No, that was another one. That was with the panel of four. Dorothy Cogallon and I can't remember who else was on that. And somebody would come out and they'd be asked questions and you'd have to guess their job. You are showing your age if you remember What's My Line, because that was about the same time. Exactly. I'm telling on myself. Ms. Calzone, maybe you can disconnect and dial in again. Oh, there you are. Now I'm afraid we're going to be getting feedback. I've muted my line. You called in? And I've called in. There's some echo. I'll leave it up to you. We can proceed with the echo or you can leave and come back in if you'd like. I'm not sure what's best, Your Honor, but we'll have to get rid of the echo. Should we all disconnect and re-connect? Well, now you're mute buttoned again. Excuse me. This is Lisa from IT. I'm sorry. I joined because I saw you were having some issues. The best thing for you to do is not to just call in through your phone because it's still picking up the audio from your computer. So if you are on the phone and you're having some issues, look up at the top. If you click on the little carrot next to your mute button, you actually want to switch to phone audio, and that will remove the audio from your actual computer. And then it'll dial in and it'll remove the audio. So maybe hang up the phone and then click on switch to phone audio. It'll give you the number and prompt you through, and then you'll be able to remove all that background noise. I've got to tell our chief I'm no longer a believer in technology. I was swearing by this format. I thought it was great having second thoughts about that. He'll be happy to hear that. Wonderful. It's wonderful when it works. Still showing you that you're muted. Can you hear me? Now I can. We have the same problem. The echo is back. Do you want to just try hanging up and joining again? Is this any better? Yes. Yeah. You can hear me? I can hear you. Is there any echo? I don't hear an echo now. Okay. Thank goodness. I apologize for that. I'm sorry, but your time is up now. I couldn't resist that. I'm sorry. Thank you for your patience. I'm so sorry if I can start over. It's okay. Thank you. Yes, I'm Sabrina Camazoli, and I represent the AFL-E, the government in this matter. What I would like to do first, Your Honors, if I may, is to take you through every relevant paragraph of the affidavit for the search warrant to explain to you why there was probable cause here, because this is a very factually complicated case. If it's all right with you, I'd actually like to give you paragraph numbers and page numbers to explain why there's a probable cause. Thank you. Then I would like to explain why the 2016 report differs from the what happened at the grocery and the reliability of- The grocery. Is that Dave's Store? Correct. Dave's Store, which is owned by TUDIS. First, let me explain that there are actually three paragraphs in the affidavit that have three different phone numbers for TUDIS in them. Those paragraphs 3B, 11, and 22 at pages 203, 210, and 216, respectively, of the appendix. The very first paragraph, 3B, has the current, the latest TUDIS cell phone number, which TUDIS gave to the CI. Which volume of the appendix are you in? I'm in volume one. No, I'm sorry. Page 203 is volume two. Volume two, your honor. All right. Paragraph 3B is the latest TUDIS phone, and the CI has that number because TUDIS gave it to him. Paragraph 11 on page 210 explains that there was evidence that TUDIS had been using and then stopped using a different cell phone number one month prior. Page 210, paragraph 11, and that was the number ending with 6335. So, that paragraph basically explains that he was using that number and dropped it. The third cell phone number that is in the affidavit for TUDIS is in paragraph 22, and that is the cell phone number TUDIS gave to the CI in which he said, page 216, paragraph 22. Okay. TUDIS gave the CI another cell phone number ending in 2044 to call when he wanted drugs and said, use the name Santana. Whenever you call me, TUDIS said, use the name Santana over the phone. Using this in paragraph 22? In paragraph 22, there is the number that TUDIS gave to the CI for Santana. Now, where he says, um, where the, also, I'm sorry, paragraph 19 and paragraph 21 also set forth the entire- Okay, 22 just refers to a discussion with Jewel. That Jewel stated that he was- I'm sorry. Perhaps it's 21 or 19. Okay. But essentially, what these paragraphs, my 18, sorry, 3B11, um, I apologize, Your Honor. There is the other paragraph, and I will find the citation for it. You need to do a 20- That's the business card. That is the business card. So, essentially, what happens is that the CI and TUDIS meet over the summer of 2014. The CI asks TUDIS for work. TUDIS says, real work or street work? And the CI says, real work. And TUDIS says, I don't have any. I can give you street work. And then he proceeds to tell him code words to use to purchase heroin, marijuana, and cocaine, and code words for quantities. He instructs the CI to communicate with his brother, Jewel, when he wants to buy drugs, because Jewel deals for him in Summers Point, New Jersey. That is later corroborated because- But this is all- I'm sorry. I think you're about to answer the question I was going to ask, so say it again. I'm sorry. So then I was about to say that Jewel also corroborates that he sells drugs for his brother, and that's in paragraph 22. And is that because that's what the CIA told him? Correct. All that is from the CI. Yes, but the CI also has a business card, and he claims this corroborates what the CI says, that he actually met with TUDIS. Because on the front of the business card, it is for TUDIS's business, and the bottom of the card, which has yet a different phone number on it, says Toy. On the back of the card, in handwriting, which is the CI's handwriting, it says Jewel in a number, and Santana in a number. What's the number? The Santana, what's the number? The number for Santana on the business card, I believe, ends in 2044. I think it's 431-2044. Okay, why isn't that Jewel's number? Why isn't that Jewel's number? Because Jewel- because there are two phone numbers on the back of the business card. One is for Jewel, and one is for Santana. Those are two different people and two different numbers. Well, you're saying two different people. I thought the Santana, in fact, was Jewel and not Toy. The evidence at the inception demonstrated that TUDIS told the CI to call him Santana over the phone. Right, but my trouble with all this is, all of this is coming from the CI. Mr. King's point is, under Gates, there's got to be some showing in the affidavit of the CI's reliability. I'd like to mention two things that I believe show that the CI is reliable. One is that Dorn did say that he worked with him in the past and he had been reliable, but also, and much more importantly, is when you read the affidavit in its entirety, everything that the CI tells Dorn comes to fruition. Everything the CI tells Dorn comes to fruition, but we don't know that, because you've got the video in the store. We don't know if Toy's in the store. Because what happens is, TUDIS gives him code words to buy drugs. He says, call my brother and use these code words. Wait, TUDIS, who's TUDIS? Jewel TUDIS. Boy, no. No, Toy TUDIS met with the CI, gave him the business card, and said, when you want to buy drugs, call my brother. Right, but that all comes from the CI. Okay, that's what the CI says. But when the CI does make those calls and uses those code words, he gets exactly what he's looking for in terms of the drugs. But he goes to the store, Jewel answers, no, Toy answers and says, call my brother. Correct. When he calls Santana, when he calls the number for Santana, Toy answers and says, call my brother. And then he immediately calls the number for Jewel and sets up a deal for a box of donuts, which he then purchases the next day, which turns out to be cocaine. Now, I would also like to jump ahead, if I might, because the CI and Jewel then complete nine different drug deals. And the affidavit says, one of those drug deals happened at Dave's store, which is owned by TUDIS. And as it's explained in the affidavit, I'm sorry, was there a question? Paragraph. Paragraph. Oh, yes, I'm going to get to that. The paragraph in the affidavit, just a moment. It is the drug deal that occurred, I believe, on September 9th. I'm sorry, I have many notes here. This is September 25th. I don't see September. No, I'm sorry. If you don't mind, just a moment. How about paragraph 44? Yeah, 44. Yes, I apologize. This is at Dave's grocery. Paragraph 43 to 44 on page 230 to 231. So the night before the drug deal that happens in TUDIS' store, the CI and Jewel are on the phone, and the CI asks to purchase drugs using code words. And Jewel says, I need to call my brother to find out where he's working. And it's clear that he needs to do that before he can arrange the drug deal. The next day, Jewel and the CI arrange a drug deal, and Jewel arranges it to take place at TUDIS' store. When the CI goes into the store, he sees a man behind the counter in an orange T-shirt, and the CI thinks and believes that that man is TUDIS. And when he comes out of the store, and he's debriefed by Detective Dorn, he tells Dorn, Toy TUDIS was in the store, and he was behind the counter, and he told me, I can have anything I want. It's free. Now, Dorn believes the CI that TUDIS was behind the counter, and puts that in his affidavit. Now, that doesn't go to whether or not the CI is reliable, because we don't know in the video. You can't tell if Toy is in the store or not. In the video, it's very hard to see anything, and it's very hard to hear anything. But there are other reasons why there is probable cause in this to believe that Toy TUDIS was dealing drugs, and it's not simply a conclusory statement in the affidavit. So, for example, there are two paragraphs in the affidavit that I think are important, because it explains how Dorn knows that TUDIS is a multiple kilogram drug dealer, and that is paragraph 20 and paragraph 11. Paragraph 20 on page 215 basically says that Dorn has spoken to agents and officers from the FBI, the DEA, the Atlanta County Prosecutor's Office, where he himself is a detective, the Atlantic City Police Department, and the Pleasant and they have shared with him intelligence gathered over 20 years that indicates that TUDIS is a multiple kilogram drug dealer of cocaine and leads a large narcotics network. He says that he talks about working with the CI before he doesn't say that never amounted to anything, and then he goes on to say in a lot of these allegations about Toy, he's a high-level distributor, he's alleged to have political contacts, he represents himself as a businessman, you know, it's isn't that exactly the kind of thing that Gates warned against? I think he is summarizing what he has learned from the 20 years of intelligence that's been collected. Now, I suppose if Judge Delury did not find that sufficient, he could have asked him for more precise details, but Judge Delury approved the warrant. But that's why we're here. If we didn't approve the warrant, we wouldn't be here. Well, we're here. We're here, Your Honor, because Judge Simando found that Judge Delury had a substantial basis to find probable cause in the Dorn affidavit. And when the district court looks at an affidavit that has been approved by a state court judge, if there are slight doubts, the district court judge will resolve those doubts in favor of the issuing court. What's your argument based on, what's your argument based on paragraph 11? Paragraph 11 is, oh, I apologize. Yes, that is the paragraph where I believe he explains that there had been an 18-month-long federal investigation previously. That investigation had been into Torzine Tiller, who ended up being a co-conspirator of Tudis' and Dorn is aware of that investigation, but he explains to Judge Delury that he is not going to put any information gleaned from that federal investigation into this affidavit because some was obtained using techniques that are not kosher under the state constitution, but are under the federal constitution. He said he wasn't going to put it in there, but he says, you know, I'm aware the federal law enforcement officers have used investigative techniques not admissible in the Jersey courts. I'm not going to use this. Then he goes on to say all the stuff that he did based upon those wiretaps. He does not go into detail. He basically says there was an investigation. There was a wiretap. Tudis was intercepted on the wiretap, but he does not go into detail about the content. Is that the concluding argument when you say, I'm not going to argue to you that my witness has said such and such and such should be remembered? I'm not going to argue this. By doing that, you're doing exactly the opposite. He's afraid that he's not permitted to tell Judge Delury about any evidence that may have been gathered through techniques that a state court would not authorize. What he's saying is a part of a long-term continuing federal joint state law enforcement targeted at several large-scale drug traffickers. He's telling the judge, look, this guy's a large-scale drug trafficker in Atlantic City and the surrounding New Jersey region. I'm not going to tell you that because I can't tell you that because it's illegal under state law. It's very cleverly done. There's the other paragraph in which he says he has relied on the intelligence collected not just by federal agents but also by members of his own office and two local police departments. I can tell you the Tortoise Tutus was named as a targeted reception by one or more of these various applications and will be intercepted again if the court approves this. It goes on and on and on to tell the judge all the stuff that he's saying, I can't tell you all this because it was probably obtained pursuant to a violation of state law. And what he goes on to say, and this is on page 210, is that despite the federal investigation, it has not resulted in the dismantlement of Tortoise Tutus' drug trafficking operations. And that also explains why they're continuing to investigate at the state level. If there are no questions about this precisely, what I'd like to jump ahead to, if I may, to answer Judge McKee's very first question to Mr. King, which was, what is this report and why and how is it different from the affidavit? So Detective Dorn's affidavit for the roving wiretap was authored September 26, 2014. Fast forward to February of 2016. The government is now actually starting to prepare for trial and the attorneys ask Detective Dorn, can you explain to us who wrote this stuff on the back of Tutus' business card? And Dorn, to make sure he understands exactly what happened, calls the CI and they have a three minute long phone conversation during which Detective Dorn takes no notes. Seven or eight days later, Detective Dorn writes the report based on that phone conversation. And as he testified before Judge Simando, he was careless and he was sloppy and he made two mistakes in that report that contradict what he said in his affidavit from September of 2014. And that is, I will again give you page numbers for that. In his testimony, which is on page 459 to 461, and that is, I believe, volume six. I'm sorry. I'm sorry. I believe it's in volume three of the appendix, pages 459 to 461. He explained that his February 2016 was done carelessly and sloppily and it contradicted his affidavit in two respects. So, for example, the report says the CI got the business card from Jewel, but the affidavit says he got it from Tutus. Dorn sticks by his affidavit. Let's say Tutus. They're both Tutus. Try to use the first name. I'm sorry. I'm using Tutus to mean toy. Okay. So, the report says the CI got the business card from Jewel, but the affidavit says he got it from Toy. Dorn sticks by the affidavit in which he says the CI told him he got the business card from Toy. And the report from February 2016 was incorrect because he wrote it eight days after a three-minute phone conversation in which he did not take notes. The second discrepancy in that from Toy on July 25th, but he actually got it on August 4th of 2014. The August 4th date is the one in the affidavit. Now, Judge Simandl concludes after watching and hearing Detective Dorn testify that Detective Dorn made no incorrect statements. And that he made no intentional misstatements. Intentional. Yes. Correct. Exactly. He made no intentional misstatements. The report from 2016 was wrong. Judge Simandl found Dorn entirely credible and that his errors in the report were a result of carelessness. He later determined that even if he were, this is during the Frank's hearing, even if he were to excise the paragraph of the affidavit about which Tudas complains, there would still be enough left to support the probable cause finding made by Judge Delury. And I think that Judge Simandl's findings here are truly critical in his examination of the entire record. Because he did look at the affidavit in its entirety. He did take testimony on this at the Frank's hearing from both Tudas and Detective Dorn. Well, you know, that's a powerful argument. My problem, I guess, is that if you take the information purportedly derived from the CI out of it, I'm not sure that what remains is sufficient because it all is just a legal conclusion or it comes from the CI. And I don't know if there's enough left to establish the reliability of the confidential informant if you take everything else out of it. That may not matter to you because you've got the credibility finding by Judge Simandl, which is a substantial hurdle for Mr. King to overcome. Well, I think that the CI's information can be corroborated. He can corroborate it by himself insofar as, you know, what he told Detective Dorn would happen, happened. He did call the number that he was given by Tudas for Santana. Santana, who Dorn and the CI believe was Toy, answered the phone and said, call my brother. Granted, those are only three words, but Detective Dorn could recognize his voice based on having heard it in the past and certainly based on how he heard it. Was it two years ago that he heard it? No. So, the roving wiretap on Toy's phone was obtained within weeks after the roving wiretap on Jewel's phone was obtained. So, Toy was speaking on the Jewel wiretap just weeks before Detective Dorn applied for and received the Toy wiretap. So, he heard his voice relatively recently and he could corroborate himself that it was Toy's voice by the context of what he and Jewel were talking about in terms of their personal conversations where if they would say they're going to visit Mom or he was going to visit the mat, which is what he called his laundromat, the laundromat that was owned by Toy. What is that? There's some conversation in there about Yum Yum, I think it is. I'm not sure. I'm not sure, Your Honor. That's Chef Yum Yum or at least Yum Yum, which was Joseph's social media name. Okay, I got it. Okay. I apologize, Your Honor. I did not catch that. Judge Simandl not only had the benefit of hearing Detective Dorn's testimony, but he did very carefully look over Dorn's affidavit and found that viewed in its entirety, it demonstrated a fair probability of Tudor's involvement in the criminal activity. And I do think that's enough both to establish the CI's credibility here as well as the probable cause. And to the extent there are conclusory statements such as Toy Tudor is a multi-kilogram drug dealer, that is backed up by a couple paragraphs in the affidavit in which Dorn explains his history of knowing about Toy Tudor. This was from the information that he couldn't bring to the attention of the federal court because it was obtained in violation of... Well, there's also... I mean, he says two things, right? There's that paragraph 11, where he says, I can't tell you everything I know about... I can't tell you what I'm about to share with you. Listen up. There is one. And then there's also paragraph 20 in which he basically says, Tudor has been on the radar screen of state and local law enforcement for 20 years. Now, this should not be surprising. He does not get into Tudor's criminal history in the affidavit and therefore it cannot... Judge Delorey certainly could not rely on it, but it is certainly true based on what we know in the PSR that Tudor did have at least four convictions for distributing drugs in that 20 or 22 year period. So this is not the first time Toy Tudor has appeared on law enforcement's radar screen when the CI shows up with Detective Dorn and says, hey, I got this business card and I can now deal drugs with Toy and Jewel. It is clearly not the first time. Help me with the sentencing. In Hodge, we did not go so far as to say that these linked pleas are unethical, but we did say they're very troublesome. The first time ever, actually, other than meeting Hodge, the first time I really dealt with it. And I find them incredibly problematic. And I'm not sure what the... I know the justification is just to try to save some trial government resources, which is always a legitimate reason for having a plea agreement, but to tie the deal of person A to the deal of the person B, obviously you're putting the thumbscrews on person A. Maybe this is the case where we should just say, maybe in Hodge, we didn't go far enough. These things are unethical and we condemn them and the government should not engage in them. I've got to reflect on this. And then to raise the ante on person B, to jack up and tighten up the vice grip you have on person A, it's troubling. Well, Your Honor, you are correct that Hodge said that these package pleas are not inherently coercive. However, district court judges have to be aware of them so that they can ensure all the parties are entering into them voluntarily. I don't think that we said that they weren't inherently coercive. I think we said to the contrary, and that's why they have to be... That's why the colloquy is necessary. They don't necessarily... I believe it said package deals are not inherently coercive, but the judge's goal has to be to ensure that they're voluntary because there are reasons why influence could be meted out between the different defendants. The reason for the discount in terms of why did Vega get a better plea offer, I think I should put in context of all of the plea negotiations, which Troy Archie testifies about during the hearing on Tudis' motion to withdraw his plea. Who is Troy Archie? And specifically, Troy Archie was Vega's lawyer. Okay. And he testified and Vega testified and Michael Farrell testified below when Judge Simandl was considering whether to allow Tudis to withdraw his plea agreement. And specifically, I'm going to point you to pages 1263 to 1265 of Troy Archie's testimony. And he explains the history of his plea negotiations with the government on behalf of Vega. And that originally in January of 2016, there was no package plea. Both the parties were negotiating independently and the government had offered Vega a sentencing range of 70 to 87 months. Later, 10 months later, in October of 2016, they began talking about tying the pleas together so that they could resolve the case. And in order to induce Troy Tudis to plead guilty, the government offered a package plea in which Vega would have a sentence capped at 60 months. So Vega's deal got better. If she would enter a packaged plea, instead of having a range of 70 to 87 months, which they had previously offered her, she would have the opportunity to get a sentence capped at 60 months. And that was the plea offer extended to Vega in the packaged form on October 27th. That's okay. So far, I'm looking for the part that's not coercive. Absolutely. Okay. So I'm getting there, Your Honor. Okay. Counselor, isn't it possible that Tudis thought that it was a package deal? That that's what was in his mind from these various offers going back and forth that he thought it was a package deal? And isn't that the basis? Isn't that why the special colloquy is necessary? If it had been packaged, but all the evidence points to the contrary. And that's not what I said. I said, isn't it possible that Tudis thought it was packaged? It's possible, except for the fact that Judge Simandl found that Tudis and Farrell both lied in an attempt to get out from under his guilty plea. They lied to the court in an effort to essentially perpetrate a fraud on Judge Simandl that they did not realize it was not packaged. Judge Simandl simply did not believe that, looking back at the history of what happened. And if I could go through the history of what happened between October 27th and November 1st, I think that would be helpful. So October 27th, both Tudis and Vega receive packaged plea offers. Vega signs hers. Tudis rejects his, which means Vega then was a nullity because she couldn't enter into a packaged plea without the other half of the package. Then the next day, which is October 28th, Farrell raises the possibility that Tudis may want a stipulated bench trial instead of going to trial before a jury and instead of taking a plea because he wanted to reserve all of his appellate rights to challenge the suppression move. No, he could do that without a trial. It was clear. He could do that without going to trial. But that's ultimately what he did a few days later, by entering into a plea, reserving his right to appeal. But on October 28th, when Farrell suggests that Tudis go to trial by himself in a stipulated bench trial, it is clear that Vega is not going to go to trial with him, but Vega still wanted to plead guilty. Therefore, how could their pleas be coupled? Over the weekend, Farrell negotiates with the government to come up with what the stipulated bench trial would look like. In the meantime, he's also simultaneously negotiating with the government for a new plea deal for Tudis in terms of getting what Tudis wants. Tudis wanted to reserve his right to appeal all these issues that we're here for today. He wanted to claw back some properties from forfeiture, specifically business properties that his family could then use to support themselves while he's in jail.  And once they come back to court on Monday, it is clear to Judge Simando and to everyone that the pleas are no longer tied. Vega has her own plea deal that she very much wants to enter, even though the government offered her the old guideline range, which was 70 to 87 months. She still wanted to take it, and there's evidence in the record that she was thankful that she could get out and take that plea. And the evidence in the record indicates that what Tudis is negotiating for is not a lower sentence for his wife. The only thing he's negotiating for are his appellate rights and his ability to claw back property. And if you look at the unguarded conversation, which is the conversation the night before they pled guilty, which Judge Simando read the transcript of, it is not clear at all that they're talking about a package plea. What Tudis basically says to Vega is, I'm going to take the stipulated joint, which doesn't sound like a package plea. It sounds like he wants to go to trial. He wants a bench trial with stipulated facts. But then he says to her that he's continuing to negotiate a plea agreement because he wants to get properties back for his family. And he says, you know, I'm a man. I want to take care of my family. And it appears that he is continuing to negotiate hard for his properties. He does not say or even imply that he's doing this to try to get Vega a lower sentence. And Vega was under the impression that she could do whatever she wanted and she could plead guilty no matter what Tudis did. It was everyone's impression until later we find out that Farrell and Tudis seem to have no idea that the pleas were untied. Now, granted, they had sufficient time to review the plea agreement. The package language was in the very first paragraph on page one. It was then deleted from the very first paragraph on page one. Tudis and his lawyer spent so much time going over the plea agreement that you can see the handwritten changes and additions that Tudis and Farrell worked out, which Tudis actually signed. We know he wrote a plea agreement because he made handwritten changes to it and signed his initial to those paragraphs. And we'll cut to you. We've had both sides for quite a while here, but we do understand your argument. And you're making a pretty crantling of the brief. So let's hear back from Mr. King on the rebuttal time. Mr. King, on the rebuttal, I'm going to be a little bit tighter on you than I was when you initially argued. We'll be here until the weekend. You're muted. You're muted. Thank you, Hannah. I did realize we were going to be on express for time. A couple of things. There's no doubt that Detective Dorn wanted Toy Tudis. He wanted Toy Tudis for years. And I think we cannot allow Detective Dorn's so-called mistakes to always work against Toy Tudis and to his benefit. Now, I'm going to go in reverse order, Judge, as far as Mr. Tudis's ineffective assistance to counsel or the package plea, the involuntariness of his agreement. It wasn't accurate, Judge, that they knew that that plea offer was unpackaged. There's a plea offer dated the very day before that that still contained the package language. The first time that the package language was removed was on the November 1st date, which is the day he signed. Now, Mike Farrell and Toy Tudis— Was that the day that he made the handwritten notations on the agreement? I think that's correct, Judge. I think on that day when they signed that agreement, that's when they were clawing out property and things like that. But that would be consistent with your opponent's argument that he went through what he made, handwriting notations on it. Even if it's the same day as the plea was entered, it still could suggest that he read the first page, which was where the language was removed. No, but Judge, see, that's what it was. There were a lot of different ideations of that agreement. It started from sometime in October, and it kept going, changing constantly. So once they got past an issue, he didn't go back and say, let me look at page one again. He knew they were past that. The only thing they were talking right now was this addendum about the property. That's the only thing that was being negotiated. Everything prior to that had already been decided. He had no reason, from a practical standpoint, to go back and look at that from page one. But then what do we do with Judge Mandel's finding of fact that he, in fact, did know that it had been unpackaged? You've got a very, very experienced, highly respected child judge who unfortunately is no longer with us, whose main finding is the fact we can't just ignore those credibility determinations, can we? No question, Judge. I'm not asking this court to ignore the credibility. But, Your Honor, this court also can't rubber stamp that decision. This court also is required to look at the facts from a clear lens and say whether that was an error. And, you know, not just Judge Mandel, but I think in this case, the court just made an error. It was a situation where, to lay to this, I and my family at that point in time of the precedent was, and we understood, this was a package deal. We're not even arguing that no more. We never even tried to negotiate that fact. The only thing we're negotiating right now is the property. So why would I go back and look at that because I'm way down the road on that. I'm not trying to go back to chapter one because I'm already at chapter 15, for example. So they didn't know that. They didn't know because, and here's the thing about the conversation the night before, that he had with his wife. He said, honey, tomorrow I'm going to get you out of this. What power did he have to get her out of it? The only thing he could have done to get her out of it was to take the plea. And if that was the case, that's his belief. It shows, and exactly the question that Judge Fischer asked, is it, you know, is it possible that, to lay to this, believe they were still packaged? It's obvious the night before, when he had a conversation with his wife, when he said that he was going to do something affirmative to get her out of it, he believed they were still packaged. The only thing that he could have done to get her out of it was the plea. He had no power to do anything else that would get her out of the case other than to accept that plea. And that's what he told her the night before in an unbiased conversation just between husband and wife. Honey, I'm going to take the stipulated joint tomorrow. I'm going to get you out of this. Don't worry about it. I'll do it. I'll take care of that. So in his mind, the next day, he was going to go ahead and plead to get her out of the case, because by him doing so, that would extricate her, and she would be able to, you know, go on with her life, you know, get the sentence. They wouldn't continue to ramp up the, you know, the charges. Now, very briefly, Judge, Detective Dorn, we have to look clearly at his motives and his conduct. If, in fact, he wanted to know whether those numbers on that card belonged to Toy Tootis, the only thing he had to do, which is a very, very common investigative technique, was to run a number. He could have just called him, you know, and said, look, who these numbers belong to. He never did that. And when he supposedly, when the C.I. came out of Dave's store, and he had the audio and the video, Detective Dorn said he took it back to the prosecutor's office, downloaded, wrote his report, and presumably, he looked at it and listened to it. At that point in time, on that day, he should have known that that video was, you know, we couldn't make out anything, and we can't make out the audio. So why would you include that in your affidavit knowing that it does not represent what you're saying? And even if Judge Dorn had looked at that video, it is not going to prove that Toy Tootis was in that. And when he said he saw on that day, when he looked at the video that he downloaded on that day, he said he realized it was not Toy Tootis. It was Jules who said, you can take anything you want. During the Frank's hearing, Toy Tootis said, that's my other brother, George. That's not even me. That's not even Joseph. Well, right. George Joseph. That's correct. There was another brother, Joseph. He said, that's Joseph. That's not even me. So all those investigations, we have to, you know, sometimes I will use our collective intelligence. If, in fact, this investigation was as thorough as they said. Well, it's very sloppy, but that does not necessarily mean that he doesn't survive the credibility finding, though. There's never, there's not a video or anything that puts Toy and this CI ever in the same place. There's never, you know, when Toy says, call my brother. That could have been from Joseph. That could have been from his other brother. And let me say this. Let's suppose for a second that Toy knew that Joe was in the drug business. And he picked up the phone and here's somebody who wants to talk about drugs. He just said, look, hey, call my brother. I understand that. I understand. Call my brother. I do want to just mention, I did pull up and just quickly do a search through Hodge. And Ms. Kamisola, you were correct. The court said, in fact, that this court, of course, should remember the package deal plea bargains are not inherently coercive. So you're right about that. I misspoke when I challenged on that. But thank both of you for argument in a very interesting case. I will ask again that we get a transcript and ask for the government to bear the cost of that. And Patrick will take care of making sure that folks know how to get a transcript to us in this. I think it's just because of the paragraphs were mentioned in the affidavit and that kind of thing. It's helpful to have that in front of us when we review this case.